**CARNEGIE MELLON UNIVERSITY and Three Rivers Biologicals, Inc., Plaintiffs,**

v.

**HOFFMANN–LaROCHE, INC., Roche Molecular Systems, Inc., the Perkin–Elmer Corporation, Chiron Corporation, Cetus Oncology Corporation, Roche Diagnostic Systems, Inc., and Roche Biomedical Laboratories, Inc., Defendants.**

No. C 95–3524 SI.

United States District Court, N.D. California.

May 12, 1999.

Arland T. Stein, Frederick H. Colen, Reed Smith Shaw & McClay, Pittsburgh, PA, Walter P. DeForest, DeForest & Koscelnik, Pittsburgh, PA, Eugene J. Majeski, Ropers Majeski Kohn & Bentley, Redwood City, CA, for Plaintiffs Carnegie Mellon University and Three Rivers Biologicals, Inc.

S. Leslie Misrock, Stephen S. Rabinowitz, Gidon D. Stern, Pennie & Edmonds LLP, New York City, Vanessa Wells, Heller, Ehrman White & McAuliffe, Palo Alto, CA, for Defendants Hoffman-La Roche, Inc., Roche Molecular Systems, Inc., Roche Diagnostic Systems, Inc., Roche Biomedical Laboratories, Inc., and Perkin-Elmer Corp.

Harold J. McElhinny, Tamu K. Sudduth, Matthew I. Kreeger and Constance T.Y. McComb, Morrison & Foerster LLP, San Francisco, CA, for Defendants Chiron Corp. and Cetus Oncology.

## ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTIONS TO EXCLUDE THE TESTIMONY OF PLAINTIFFS' EXPERTS; AND GRANTING DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT

ILLSTON, District Judge.

Plaintiffs Carnegie Mellon University and Three Rivers Biologicals, Inc. (collectively "Carnegie Mellon") contend that defendants Hoffmann–La Roche Inc., Roche Molecular Systems, Inc., Roche Diagnostic Systems, Inc., Roche Biomedical Laboratories, Inc., Laboratory Corporation of America Holdings, and the Perkin–Elmer Corporation (collectively "the Roche defendants") and Chiron Corporation and Cetus Oncology Corporation (collectively "the Chiron defendants") have infringed claims 1–6, 10–19 and 22–40 of U.S. Patent No. 4,767,708 ("the '708 Patent") and claims 1–

2, 11–12, 14–15, 17–18, and 32–34 of U.S. Patent No. 5, 126,270 ("the '270 Patent"). The '708 Patent and the '270 Patent are both entitled "Enzyme Amplification and Purification" and involve recombinant DNA technology. Both the Roche defendants and the Chiron defendants have moved for summary judgment on the issue of infringement of the '708 Patent. Also before the Court are defendants' motions to exclude the testimony and declarations of plaintiffs' experts.

For the reasons set forth below, the Court hereby (1) GRANTS the Roche defendants' motion to exclude the declaration of Dr. William E. Brown; (2) GRANTS in part and DENIES in part the Chiron defendants' motion to exclude the testimony of plaintiffs' experts; and (3) GRANTS the defendants' motions for summary judgment of non-infringement of the '708 Patent both literally and under the doctrine of equivalents.

## BACKGROUND

### 1. Relevant Technology [1]

Proteins are biological molecules of enormous importance. Proteins include enzymes that catalyze biochemical reactions; major structural materials of the animal body; and many hormones. Numerous patents and applications for patents in the field of biotechnology involve specific proteins or methods for making and using proteins. Many valuable proteins occur in nature only in minute quantities, or are difficult to purify from natural sources. Therefore, a goal of many biotechnology projects is to devise methods to synthesize useful quantities of specific proteins by controlling the mechanism by which living cells make proteins.

Protein molecules are composed of long chains of amino acids. To make a protein molecule, a cell needs information about the sequence in which the amino acids must be assembled, since the sequence of amino acids determines the characteristics of the protein.

The cell uses a long molecule, DNA, to store this information. DNA molecules do not participate directly in the synthesis of proteins. Instead, DNA acts as a permanent "blueprint" of all of the genetic information in the cell, and exists mainly in extremely long strands (called chromosomes) containing information coding for the sequences of many different proteins, most of which are not being synthesized at any particular moment. DNA strands are made up of nucleotides, the sequence and combination of which in the DNA strand specifies the particular sequence of amino acids in a particular protein. The specific region of DNA on the chromosome that codes for the sequence of a particular protein is called a gene.

To make a specific protein by expressing its cloned gene in bacteria,[2] several technical hurdles must be overcome. First the gene, or DNA coding region, for the specific protein must be isolated for cloning. Next the isolated gene must be introduced into the host bacterium. This can be done by incorporating the gene into a cloning vector. A cloning vector is a piece of DNA which can be introduced into bacteria and which will then replicate itself as the bacterial cells grow and divide. One type of cloning vector is a plasmid, a small circular loop of DNA found in bacteria, separate from the chromosome, that replicates like a chromosome. Because of its small size, a plasmid is convenient for the molecular biologist to isolate and work with.

1. This overview of DNA technology is excerpted from the Federal Circuit's decision in *In re O'Farrell*, 853 F.2d 894, 895–97 (Fed.Cir. 1988).

2. "The process of making large quantities of identical copies of a gene (or other fragment of DNA) by introducing it into [bacteria] and then growing those cells is called *cloning* the gene. After growing sufficient quantities of the transformed bacteria, the biotechnologist must induce the transformed bacteria to *express* the cloned gene and make useful quantities of the protein." *In re O'Farrell*, 853 F.2d at 898.

Recombinant DNA technology is used to modify plasmids by splicing in (recombining) cloned genes and other useful segments of DNA containing control sequences. Short pieces of DNA can even be designed to have desired nucleotide sequences, synthesized chemically, and spliced into plasmids. A plasmid constructed by the molecular geneticist can be inserted into bacteria, where it replicates as the bacteria grow.

## 2. The '708 Patent

The '708 Patent is directed to "novel recombinant plasmids for the enhanced expression of an enzyme, to the preparation by gene cloning of such plasmids, to bacterial strains containing said plasmids and to methods for the conditional control of the expression of said enzymes." '708 Patent, column 1 lines 8–13. The '708 Patent includes three independent claims: 1, 25 and 39. The remaining claims in the '708 Patent are dependent on claims 1, 25, or 39. In particular, claims 1–19 and 22–24 involve a "recombinant plasmid containing a cloned complete structural gene encoding region isolated from a bacterial source for the expression of DNA polymerase I." Claims 25–38 involve a "process for constructing a recombinant plasmid for the expression of DNA polymerase I." Claims 39–40 involve a "host strain of cells containing a foreign plasmid capable of expressing DNA polymerase I."

On March 31, 1997, the Court issued an order interpreting these claims. In the claim construction order, the Court held that the term "DNA Polymerase I" in the claims of the '708 Patent referred to an enzyme that is lethal or debilitating to growth of the host cell strain when expressed from a multicopy plasmid and that exhibits three enzymatic activities, namely, 3'–5' exonuclease activity, 5'–3' exonuclease activity and polymerase activity.

## 3. Defendants' Polymerase Products

The Roche defendants and Chiron defendants have developed six plasmids for the commercial manufacture of six recombinant DNA polymerases:

plasmid pLSG5 encodes *Thermus aquaticus* ("Taq") DNA polymerase, which defendants claim lacks 3'–5' exonuclease activity;

plasmid pLSG8 encodes a truncated fragment of Taq DNA polymerase, called Stoffel fragment, which defendants claim lacks both 3'–5' exonuclease activity and 5'–3' exonuclease activity;

plasmid pRDA3–2 encodes a mutant version of Taq DNA polymerase, called CS mutant, which defendants claim lacks both 3'–5' exonuclease activity and 5'–3' exonuclease activity;

plasmid pLK103 encodes a double-mutant version of Taq DNA polymerase, called FS mutant, which defendants claim lacks both 3'–5' exonuclease activity and 5'–3' exonuclease activity;

plasmid pLSG32 encodes *Thermus thermophilus* ("Tth") DNA polymerase which defendants claim lacks 3'–5' exonuclease activity; and

plasmid pTma15 encodes a truncated fragment of *Thermotoga maritima* DNA polymerase, called UITma DNA polymerase, which defendants claim lacks 5'–3' exonuclease activity.

Defendants seek an order granting summary judgment on the issue of non-infringement of the '708 Patent because plasmids pLSG5, pLSG8, pRDA3–2, pLK103, pLSG32, and pTma15 do not contain a gene encoding region capable of expressing "DNA polymerase I." Defendants contend that they are entitled to summary judgment because of the absence of 3'–5' exonuclease activity and/or 5'–3' exonuclease activity in the enzymes encoded by these plasmids. Defendants also ask the Court to find that neither the processes for constructing these plasmids nor the host cell strains containing these plasmids are capable of expressing "DNA polymerase I." Lastly, defendants move to exclude the testimony and declarations of Carnegie Mellon's experts, including

that of Dr. William E. Brown who asserts that Taq DNA polymerase does exhibit 3'–5' exonuclease activity.

## LEGAL STANDARD

"Summary judgment is appropriate in a parent case, as in other cases, when there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law." *Nike Inc. v. Wolverine World Wide, Inc.*, 43 F.3d 644, 646 (Fed.Cir.1994) (citations omitted).

Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R.Civ.P. 56(c). The moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The moving party, however, has no burden to negate or disprove matters on which the non-moving party will have the burden of proof at trial. *Id.* The moving party need only point out to the Court that there is an absence of evidence to support the non-moving party's case. *Id.* at 325, 106 S.Ct. 2548.

The burden then shifts to the non-moving party to "designate 'specific facts showing there is a genuine issue for trial.'" *Id.* at 324, 106 S.Ct. at 2553 (quoting Rule 56(e)). To carry this burden, the non-moving party must "do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). "The mere existence of a scintilla of evidence ... will be insufficient; there must be evidence on which the jury could reasonably find for the [non-moving party]." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

In deciding a motion for summary judgment, the evidence is viewed in the light most favorable to the non-moving party, and all justifiable inferences are to be drawn in its favor. *Anderson*, 477 U.S. at 255, 106 S.Ct. 2505. "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge [when she] is ruling on a motion for summary judgment." *Id.*

## DISCUSSION

### 1. Motions to Exclude Plaintiffs' Expert Testimony Under *Daubert*

The Roche defendants move to exclude the declaration of Dr. William E. Brown, one of plaintiffs' scientific experts, because his testimony fails to meet the standards for admissibility and reliability under *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993).[3] The Chiron defendants also move to exclude the testimony of Dr. Brown, as well as plaintiffs' other scientific experts, Dr. Edwin Minkley and Dr. Stephen Benkovic.[4]

Federal Rule of Evidence 702 provides:

If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of opinion or otherwise.

Fed.R.Evid. 702.

As a guide for assessing the scientific validity of expert testimony, the Supreme Court provided a nonexhaustive list of factors that courts may consider: (1) whether the theory or technique is generally accepted within a relevant scientific

---

**3.** Roche's Motion to Exclude at 4:6–22:28.

**4.** Chiron's Motion to Exclude at 5:16–18 and 14:9–11 and 11:20.

community, (2) whether the theory or technique has been subjected to peer review and publication, (3) the known or potential rate of error and (4) whether the theory or technique can be tested. *Daubert,* 509 U.S. at 593–94, 113 S.Ct. 2786; *see also Kumho Tire Co., Ltd. v. Carmichael,* —— U.S. ——, ——, 119 S.Ct. 1167, 1174–75, 143 L.Ed.2d 238 (U.S.Ala.1999). The Ninth Circuit also has indicated that independent research, rather than research conducted for the purposes of litigation, carries with it the indicia of reliability. *See Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 43 F.3d 1311, 1317 (9th Cir.1995) (*"Daubert II"*). In particular, using independent, pre-existing research "provides objective proof that the research comports with the dictates of good science" and is less likely "to have been biased by the promise of remuneration." *Id.* If the testimony is not based on "pre-litigation" research or if the expert's research has not been subjected to peer review, then the expert must explain precisely how he went about reaching his conclusions and point to some objective source—a learned treatise, the policy statement of a professional association, a published article in a reputable scientific journal or the like—to show that he has followed the scientific method, as it is practiced by (at least) a recognized minority of scientists in his field. *Id.* at 1318–19 (citing *United States v. Rincon,* 28 F.3d 921, 924 (9th Cir.1994)); *see also Lust v. Merrell Dow Pharmaceuticals, Inc.,* 89 F.3d 594, 597 (9th Cir.1996). The proponent of the evidence must prove its admissibility by a preponderance of proof. *See Daubert,* 509 U.S. at 593 n. 10, 113 S.Ct. 2786.

## A. Dr. William E. Brown

■ Defendants argue that the testimony of Dr. William E. Brown is inadmissible

because it does not constitute scientific knowledge and because it is not based on accepted scientific principles and methodologies.[5] Defendants make the following arguments in support of their motions to exclude the testimony of Dr. Brown:

1. Dr. Brown offers an opinion contrary to a scientific fact—the absence of 3′–5′ exonuclease activity in Taq DNA polymerase—that is no longer subject to debate in the scientific community;

2. Dr. Brown is not an expert on DNA polymerases or assays to measure 3′–5′ exonuclease activity;

3. Dr. Brown's testimony has none of the indicia of reliability required by *Daubert;*

4. Dr. Brown purports to reinterpret the work of a number of scientists using analyses that are not accepted within the scientific community; and

5. Dr. Brown's conclusions do not fit the issues presented.[6]

All of these arguments, to some extent, address the factors set forth in *Daubert.* Accordingly, the Court will address these arguments in the framework provided by *Daubert.*

## (1) Is Dr. Brown's theory or technique generally accepted within a relevant scientific community?

Plaintiffs rely on Dr. Brown's expert opinion that Taq DNA polymerase does exhibit 3′–5′ exonuclease activity.[7] Defendants offer substantial evidence, however, that Dr. Brown stands alone in this contention. Defendants point to two learned treatises and 16 published studies, all of which indicate that Taq DNA polymerase has no 3′–5′ exonuclease activity.[8] In ad-

---

5. Chiron's Motion to Exclude at 5:16–18; Roche's Motion to Exclude at 4:6–22:28.

6. Chiron's Motion to Exclude at 6:3–11:1; Roche's Motion to Exclude at 4:6–22:28.

7. Brown Decl. ¶ 7, at 2:12–21.

8. Chiron's Request for Judicial Notice, Exhibits 1–18. The two treatises and 16 articles include:
   A. Kornberg and T. Baker, *DNA Replication* (2d ed.1992) pages 186–87 ("The T.aquaticus (Taq) enzyme, lacking the proofreading 3′–5′ exonuclease activity present in most

dition, defendants' experts have testified on the universal agreement among scientists to this fact, also citing numerous publications in peer-reviewed journals.[9] Even

prokaryotic polymerases, might be more error-prone than E.coli pol I, and this may prove to be a matter of concern when used under PCR [polymerase chain reaction] conditions.") (attached as Exhibit 1 to Chiron's Request for Judicial Notice);

J. Sambrook, E.F. Fritsch & T. Maniatis, *Molecular Cloning: A Laboratory Manual* (2d. ed.1989) page 5.34, Table 5.8 (showing that Taq DNA polymerase lacks 3'–5' exonuclease activity) (attached as Exhibit 2);

J.M. Aliotta et al., Genetic Analysis: Biomolecular Engineering 12:185–95 (1996) ("Taq polymerase, lacking the 3'–5' exonuclease, could not extend the mismatched primer efficiently and had an extension pattern similar to Exo–Vent polymerase") (attached as Exhibit 3);

W.M. Barnes, Gene 112:29–35 (1992) ("Neither the [wild type] nor the deleted versions of [Taq DNA polymerase] have any 3'-(editing) exonuclease") (attached as Exhibit 4);

S.S. Carroll and S.J. Benkovic, Chemical Reviews 90:1291–1307 (1990) ("taq was found to be about 4–fold less accurate in DNA synthesis at 55°C than KF at 37°C assayed under conditions that suppress the 3' exonuclease activity of KF despite the lack of any detectable 3' exonuclease activity associated with taq.") (attached as Exhibit 5);

N.F. Cariello et al., 19 Nucleic Acids Research 15:4193–98 (1991) ("Taq polymerase does not contain a 3'–5' exonuclease activity") (attached as Exhibit 6);

J. Cline et al., 24 Nucleic Acids Research 18:3546–51 (1996) (referring to Taq DNA polymerase as an "exonuclease-deficient" enzyme) (attached as Exhibit 7);

K.A. Eckert et al., 18 Nucleic Acids Research 13:3739–44 (1990) ("Taq polymerase has no detectable 3'–5' proofreading exonuclease activity") (attached as Exhibit 8);

Y. Kim et al., Nature 376:612–16 (1995) ("Unlike pol I, the intervening domain in Taq polymerase has lost the editing 3'–5' exonuclease activity") (attached as Exhibit 9);

H. Kong et al., Journal of Biological Chemistry 3:1965–75 (January 25, 1993) ("No digestion of these [DNA] fragments was observed upon incubation with Taq DNA polymerase, consistent with the absence of 3'–5' exonuclease activity in that enzyme") (attached as Exhibit 10);

M.J. Longley, 18 Nucleic Acids Research 24:7317–22 (1990) ("Taq DNA polymerase was shown to lack an associated 3'–5' exonuclease activity capable of excising a 3'-termi-nally mismatched base") (attached as Exhibit 11);

K.S. Lundberg, Gene 108:1–6 (1991) ("Purified Taq DNA polymerase is devoid of 3'–to–5' exonuclease (proofreading) activity and thus cannot excise misincorporated" nucleotides) (attached as Exhibit 12);

P. Matilla et al., 19 Nucleic Acids Research 18:4967–73 (1991) ("The fidelity of Taq DNA polymerase has already been widely studied (4, 5). These studies indicate that Taq DNA polymerase lacks the 3'–5' exonuclease activity and creates both single base substitution errors and transitions, transversions, frameshifts, and/or deletion mutations during in vitro DNA synthesis.") (attached as Exhibit 13);

L.M. Mertz and A. Rashtchian, Analytical Biochemistry 221:160–65 (1994) ("Due to the absence of 3' exonuclease activity of Taq DNA polymerase (4), these mispairs are extended with much greater difficulty than their correctly paired counterparts leading to premature chain termination and reduced yield of full-length product (3'–5')") (attached as Exhibit 14);

A. Skerra, 20 Nucleic Acids Research 14:3551–54 (1992) ("Both [Vent DNA polymerase and Pfu DNA polymerase] have been reported to exhibit 3'–5' exonuclease or proofreading activity, resulting in a significantly increased base substitution fidelity compared to Taq DNA polymerase, an enzyme not displaying this property") (attached as Exhibit 15);

M. Suzuki et al., 272 Journal of Biological Chemistry 17:11228–235 (1997) ("The structure of the vestigial 3'–5' exonuclease domain of Taq pol 1 is very different, however; unlike E.coli· pol I, purified Taq pol I exhibits no proofreading activity") (attached as Exhibit 16);

K.R. Tindall and T.A. Kunkel, 27 Biochemistry 6008–13 (1988) ("Taq polymerase lacks an associated 3'–5' exonuclease activity capable of excising a 3'-terminal mismatched base") (attached as Exhibit 17);

U.K. Urs et al., 23 Proteins 111–14 (1995) ("Unlike E.coli Pol I, which possess a 5'–3' exonuclease domain, a 3'–5' (editing nuclease) domain, and a polymerase domain, TaqP [DNA polymerase I from Thermus aquaticus] lacks the 3'–5' exonuclease activity but does possess the 5'–3' exonuclease activity in addition to polymerase activity") (attached as Exhibit 18).

9. Goodman Decl. ¶ 11 & Exhibit B; Klug Decl. ¶ 11, at 4:10–4:24, & Exhibit B; PX 140, Tabs 2–27.

plaintiffs' other expert witnesses, Dr. Minkley and Dr. Benkovic, appear unwilling to reach the same conclusion as Dr. Brown.[10] Dr. Minkley and Dr. Benkovic were also unable to name any other scientist who shares Dr. Brown's belief that Taq DNA polymerase has 3'–5' exonuclease activity.[11] Consequently, defendants take the position that Dr. Brown's testimony attempts to dispute an established fact—the absence of 3'–5' exonuclease activity in Taq DNA polymerase—that is no longer subject to debate in the scientific community.

In response, plaintiffs offer no evidence to refute this contention. Instead, plaintiffs allege that defendants' criticism of Dr. Brown's testimony is "not a proper *Daubert* argument."[12] To support this statement, they rely on language in *Daubert II* that requires the Court to focus its inquiry on an experts' methodology rather than his conclusions. *See Daubert II*, 43 F.3d at 1318 ("the test under *Daubert* is not the correctness of the expert's conclusions but the soundness of his methodology"). According to the plaintiffs, any disagreement between Dr. Brown and the scientific community speaks solely to the validity of his conclusions and therefore should not be considered by the Court in assessing the admissibility of his testimony.

The Court disagrees, and finds that the opinions of the scientific community do bear on the admissibility of Dr. Brown's testimony. While *Daubert* forbids the exclusion of expert testimony on the basis of a rigid "general acceptance" test, it does not wholly remove this factor from consideration. *Daubert*, 509 U.S. at 594, 113 S.Ct. 2786. "A 'reliability assessment ... does permit[ ] explicit identification of a relevant scientific community and an express determination of a particular degree of acceptance within that community.'" *Id.* Indeed, in decisions after *Daubert*, the Ninth Circuit routinely has considered the reliability of expert testimony against the backdrop of other scientists' opinions. *See, e.g., Daubert II*, 43 F.3d at 1319 (stating that experts must "show that they have followed the scientific method, as it is practiced by (at least) a recognized minority in their field"); *Lust v. Merrell Dow Pharmaceuticals, Inc.*, 89 F.3d 594, 597 (9th Cir.1996) (finding expert testimony inadmissible because expert's opinions were not accepted by a recognized minority in his field).

Moreover, focusing on Dr. Brown's methodology rather than the general acceptance of his conclusions would not salvage his opinion. As the Ninth Circuit has noted, "[w]hen a scientist claims to rely on a method practiced by most scientists, yet presents conclusions that are shared by no other scientist, the district court should be wary that the method has not been faithfully applied." *Id.* The fact that Dr. Brown's conclusions are at odds with the scientific findings in two learned treatises and 16 published studies, and are not supported by plaintiffs' other experts, calls Dr. Brown's opinion into question. Accordingly, this Court finds that the singular and uncorroborated nature of Dr. Brown's opinion on the 3'–5' exonuclease activity of Taq · DNA polymerase weighs heavily against its reliability. *See General Electric Co. v. Joiner*, 522 U.S. 136, 118 S.Ct. 512, 139 L.Ed.2d 508 (1997) (finding expert testimony unreliable based on "analytical gap" between data and conclusions); *see also Cabrera v. Cordis Corp.*, 134 F.3d 1418 (9th Cir.1998) (finding expert testimony unreliable because it was specifically

10. When asked whether he knew to his own satisfaction that Taq polymerase exhibited 3'–5' exonuclease activity, Dr. Minkley stated that "it would not be truthful for me to say yes or no." Sudduth Decl., Exhibit C ("Minkley Depo.") at 100:16–101:5. When asked if he was suggesting that Taq polymerase possessed a 3'–5' exonuclease activity, Dr. Benkovic responded, "I don't make any statement about the 3'–5' exonuclease activity, no statement." Sudduth Decl., Exhibit D ("Benkovic Depo.") at 158:19–159:3.

11. Minkley Depo. at 120:1–12.

12. Plaintiff's Opposition to Motion to Exclude at 9:5–9.

prepared for trial and had no support in medical literature); *Rutigliano v. Valley Business Forms,* 929 F.Supp. 779 (D.N.J. 1996) (finding expert testimony unreliable because expert's theory was unsupported by extensive publication record).

The Court is also unpersuaded by plaintiffs' argument that basing the reliability of expert testimony on its general acceptance within the scientific community will unduly favor scientific orthodoxy.[13] Justice Blackmun specifically addressed this issue in *Daubert:*

> Petitioners and, to a greater extent, their amici exhibit a different concern. They suggest that recognition of a screening role for the judge that allows for the exclusion of "invalid" evidence will sanction a stifling and repressive scientific orthodoxy and will be inimical to the search for truth.... We recognize that, in practice, a gatekeeping role for the judge, no matter how flexible, inevitably on occasion will prevent the jury from learning of authentic insights and innovations. That, nevertheless, is the balance that is struck by Rules of Evidence designed not for the exhaustive search for cosmic understanding but for the particularized resolution of legal disputes.

*Daubert,* 509 U.S. at 596–97, 113 S.Ct. 2786. Consequently, this Court remains convinced that the opinions of the scientific community are a valid yardstick against which to measure the reliability of Dr. Brown's testimony, and that Dr. Brown's testimony comes up short.

### (2) Has Dr. Brown's theory or technique been subjected to peer review and publication?

Defendants argue that Dr. Brown's testimony does not represent the sort of published, independent research to which courts ascribe inherent reliability. It is undisputed that Dr. Brown has not collected any empirical data on the 3'–5' exonuclease activity of Taq DNA polymerase and has only reviewed, in response to the present litigation, the findings of those who have collected such data.[14] In addition, there is no evidence that Dr. Brown has ever published his opinions regarding the 3'–5' exonuclease activity of Taq DNA polymerase in a peer-reviewed journal or presented them in any public forum.[15] Thus, the absence of peer-reviewed publication is another factor in favor of excluding the testimony of Dr. Brown. *See Daubert II,* 43 F.3d at 1319 (finding that peer reviewed publication is a principal way that the proponent of expert testimony can show that it satisfies the first prong of Rule 702).

### (3) What is the known or potential rate of error and can the theory or technique be tested?

Application of these two factors is difficult given the circumstances surrounding the present case. *See Daubert II,* 43 F.3d at 1317 n. 4 (discussing the impossibility of applying certain *Daubert* factors). "The last two factors—testing and rate of error—do not apply ... when the expert has not done original research, but rather has surveyed available literature and drawn conclusions that differ from those presented by the scientists who performed the original work." *Lust,* 89 F.3d at 597. Such is the case here, and none of the parties contends otherwise.[16] Thus, the Court need not consider these indicia of reliability.

### (4) Is there a promise of remuneration to the expert?

The Ninth Circuit indicated in *Daubert II* that a court may also consider whether

---

**13.** Plaintiff's Opposition to Motion to Exclude 9:11–17, 14:11–15.

**14.** Plaintiffs' Opposition to Motion to Exclude at 11:21–22 (stating that "Dr. Brown's testimony is based on Defendant's own documents").

**15.** Chiron's Motion to Exclude at 7:21–27.

**16.** Chiron's Motion to Exclude at 8:5–6; Plaintiffs' Opposition to Motion to Exclude at 11:21–22.

research could have been biased by the promise of remuneration when assessing an expert's reliability.[17] *See Daubert II,* 43 F.3d at 1317. Here, as part of an agreement with plaintiff Carnegie Mellon, Dr. Brown and Dr. Minkley are entitled to share 40% of the net proceeds of this litigation until they jointly receive $4,000,-000; thereafter, Drs. Brown and Minkley jointly receive 50% of any additional recovery.[18] While there is no direct evidence that this potential compensation colored Dr. Brown's expert testimony, the Court must consider the possibility of its influence when evaluating the reliability of Dr. Brown's opinion. *See Daubert II,* 43 F.3d at 1317 (expressing concern over remuneration of expert witnesses who do not conduct independent research).

**(5) Has Dr. Brown explained his methodology and followed the scientific method as it is practiced by at least a recognized minority of scientists in his field?**

The Ninth Circuit has repeatedly stated that where evidence of pre-litigation research or peer review is not available, the experts must (1) "explain precisely how they went about reaching their conclusions" and (2) "point to some objective source—a learned treatise, the policy statement of a professional association, a published article in a reputable scientific journal or the like—to show that they have followed the scientific method as it is practiced by (at least) a recognized minority of

the scientists in their field." *Daubert II,* 43 F.3d at 1319 (citing *Rincon,* 28 F.3d at 924); *see also Lust,* 89 F.3d at 597. Thus, the Court must determine whether Dr. Brown's testimony meets this two-part test.

In explaining precisely how he went about reaching his conclusions, *see Daubert II,* 43 F.3d at 1319, Dr. Brown claims to have relied on defendants' laboratory notebooks and internal documents. Dr. Brown's declarations also cite excerpts from various scientific articles. Accordingly, the Court finds that Dr. Brown has satisfied the first prong of the *Daubert II* test.

However, the Court concludes that Dr. Brown has failed to satisfy the second prong of the *Daubert II* test. In particular, the manner in which Dr. Brown reaches his "explained interpretation" of the data is not scientific, and there is no evidence that his method of reinterpretation is practiced by even a minority of scientists in this field. *See Daubert II,* 43 F.3d at 1319. He consistently departs from scientific standards in a number of ways, including: (1) examining only subsets of the controls (the ones that do not disprove his theory); (2) failing to address and exclude alternative explanations for the data on which he bases his findings (including explanations adopted by the authors of published studies based on those data); (3) ignoring the presence of background signal in studies that infer 3'–5' exonuclease activity from counts of radioactive markers;

---

17. The Ninth Circuit stated:

> That an expert testifies for money does not necessarily cast doubt on the reliability of his testimony, as few experts appear in court merely as an elecmosynary gesture. But in determining whether proposed expert testimony amounts to good science, we may not ignore the fact that a scientist's normal workplace is the lab or the field, not the courtroom or the lawyer's office.
>
> That an expert testifies based on research he has conducted independent of the litigation provides important, objective proof that the research comports with the dictates of good science.... For one thing, experts whose findings flow from existing research

> are less likely to have been biased toward a particular conclusion by the promise of remuneration; when an expert prepares reports and findings before being hired as a witness, that record will limit the degree to which he can tailor his testimony to serve a party's interests. Then, too, independent research carries its own indicia of reliability, as it is conducted, so to speak, in the usual course of business and must normally satisfy a variety of standards to attract funding and institutional support.

*Daubert II,* 43 F.3d at 1317.

18. Powell Decl., Exhibit O ¶ 3(b).

(4) selectively examining only portions of the data from a number of studies; (5) rejecting studies reporting contrary empirical findings because they cite another study he criticizes; (6) relying on data from a notebook based on a contaminated sample that the researchers themselves had examined, tested and rejected; (7) relying on a mismatch primer extension assay to show activity, as opposed to inferring activity, and misstating the data regarding that assay; and (8) relying on sentences from scientific literature taken out of context. Certain of these problematic methodologies are discussed here for illustrative purposes.

### (a) Ms. Stoffel's thin layer chromatography experiment

In his declaration, Dr. Brown concludes that the upward smearing in Ms. Stoffel's thin-layer chromatography [19] experiment indicates that Taq DNA polymerase possesses 3'–5' exonuclease activity. Brown Decl. ¶¶ 10–11, at 3:10–4:3. Defendants' expert states that streaking or smearing in this experiment is not evidence of 3'–5' exonuclease activity; instead, smearing "is extremely common with this separation technique, and frequently arises simply from the addition of protein or salts (e.g. in buffer solutions) to a sample." Klug Decl. ¶ 15, at 6:17–24.[20] Thus, "Dr. Brown's interpretation of upward smearing in thin-layer chromatography ... is quite incorrect and violates established practice for interpreting this type of experiment." *Id.*

In addition, defendants contend that Dr. Brown again departs from valid scientific practices by failing to consider all the experimental controls:

The "Co 1" control on page 103 shows precisely the same kind of streaking—in a sample that has no enzyme at all (and therefore, of necessity, no 3'–5' exonuclease activity). Similar streaking is seen with the bacterial alkaline phosphatase (BAP) samples on page 105, and this enzyme is known not to possess a 3'–5' exonuclease activity.... That streaking also occurred in negative controls and with another enzyme that lacks 3'–5' exonuclease activity shows that it is merely a background phenomenon. By failing to consider all the controls in this experiment, and by failing to rule out other interpretations of the data. Dr. Brown has departed from accepted principles of interpretation so that his conclusions are unsound and unreliable.

Abramson II Decl. ¶ 12, at 5:1–5:15. The Court finds that Dr. Brown's reinterpretation of the data from Ms. Stoffel's thin layer chromatography experiment ignores several controls and Dr. Brown has failed to demonstrate that such an analysis constitutes a valid scientific practice.

### (b) Ms. Stoffel's perchloric acid precipitation experiment

Dr. Brown concludes that Taq DNA polymerase has 3'–5' exonuclease activity from the fact that solubilized material was obtained from the single stranded, nonannealed DNA primer in Ms. Stoffel's perchloric acid precipitation experiment. Brown Decl. ¶ 12. Defendants point out that Dr. Brown failed to consider all the controls and failed to determine whether

---

19. In thin-layer chromatography, samples are spotted side by side near the bottom of a plate. Abramson II Decl. ¶ 11, at 4:20–27. The bottom of the plate is then dipped into a shallow layer of solvent that moves up the plate through capillary action. *Id.* Compounds in the samples move up the plate at different rates, depending in part on their size: very small compounds move rapidly to the top of the plate while larger compounds move slowly (if at all) and remain at or near the point where they were applied (the ori-

gin). *Id.* At the end of the experiment, the position of radioactively labeled compounds is detected by exposing the plate to X-ray film. *Id.*

20. Defendants' expert, Professor Sir Aaron Klug, received the Nobel Prize for chemistry in 1982 and has co-authored over 216 scientific articles, principally on the structure and interaction of nucleic acids and proteins. Klug Decl. ¶¶ 4 and 7, at 2:7–8 and 3:7–8.

the data was significantly above the background signal. Abramson II Decl. ¶ 13, at 5:17–28. Without explanation, Dr. Brown ignored the counts for the 10 minute incubation and considered only the counts for the 60 minute aliquots. *Id.* In doing so, he failed to consider all the controls. *Id.* Defendants' expert explained that a 60 minute incubation with E.coli DNA polymerase I yielded higher counts than after 10 minutes, "as must necessarily result when an enzyme progressively digests a substrate and releases soluble material." *Id.* at ¶ 14. In contrast, Taq DNA polymerase did not produce such a pattern, but instead yielded random variation.[21] *Id.* The Court finds that Dr. Brown's reinterpretation of the data from Ms. Stoffel's perchloric acid precipitation experiment fails to consider the experimental data as a whole and Dr. Brown's re-analysis departs from established scientific methods.

### (c) Ms. Stoffel's incorporation assay

Dr. Brown concludes that Taq DNA polymerase has $3'-5'$ exonuclease activity from the presence of radioactivity in an acid insoluble fraction in Ms. Stoffel's incorporation assay.[22] Brown Decl. ¶ 13, at 4:17–5:21. Dr. Brown argues that radioactively labeled nucleotides could only be incorporated into the DNA strand (i.e. the acid insoluble fraction) if Taq DNA polymerase had removed the phosphate blocker at the $3'$ end of the DG69 and DG70 primers. *Id.* Defendants' expert states that Dr. Brown's analysis is incomplete because it fails to consider the relevant scientific literature concerning the specificity that $3'-5'$ exonucleases have for particular substrates. Abramson II Decl. ¶ 17, at 7:26–8:7. In particular, defendants provided testimony that the $3'-5'$ exonuclease

activity in DNA polymerases requires a $3'$ hydroxyl (-OH) end for binding and catalysis, and will not remove a $3'$ phosphate (-$PO_4$) blocker. Goodman Decl. ¶ 16, 6:22–23.

It is well known that the $3'-5'$ exonuclease activity of DNA polymerases cannot remove a $3'$ terminal nucleotide that contains a "blocking" $3'$ phosphate group. Indeed, this is shown by the excerpt from Kornberg's treatise that Dr. Brown attaches as Tab B to his declaration. *See* A. Kornberg, DNA Replication (1980) at p. 135, Table 4–7 (stating that the $3'-5'$ exonuclease activity of DNA polymerase I has "very specific" requirements for the substrate terminus and requires a "$3'$-hydroxyl" group in a specific configuration). Thus, Dr. Brown's interpretation departs from accepted scientific principles of interpretation by . . . invoking an explanation that is impossible, in view of the known substrate requirements of the $3'-5'$ exonuclease activity of DNA polymerase I. Abramson II Decl. ¶ 17, at 7:26–8:7.

In addition, Dr. Brown infers that the removal of a phosphate-blocked $3'$ nucleotide must necessarily result from the $3'-5'$ exonuclease activity of Taq DNA polymerase. Brown Decl. ¶ 13, at 4:17–5:21. Defendants, however, advance an alternative theory that the removal of the phosphate-blocked nucleotide was the result of an enzyme (a "kinase") purchased from New England Biolabs, a chemical supply house. Abramson II Decl. ¶ 15, at 6:26–7:9. They support this argument with passages taken from a New England Biolabs catalog provided to the plaintiffs, suggesting that Dr. Brown's analysis "failed to exclude alternative explanations and also failed to consider published data that renders his conclu-

---

21. The Court recognizes that Dr. Abramson inadvertently transposed two numbers in his declaration regarding the Stoffel data, but this error in no way affects the conclusion of Dr. Abramson or this Court since the actual data still indicate random variation for the samples containing Taq DNA polymerase.

22. For the incorporation assay, Ms. Stoffel ordered oligonucleotides (DG69 and DG70) in which the hydroxyl group normally present at the $3'$ end was replaced with a $3'$ phosphate group to form a "blocked" oligonucleotide that could not be extended by a DNA polymerase enzyme. Abramson II Decl. ¶ 15, at 6:28–7:3.

sion untenable." *Id.* The Court finds that Dr. Brown's interpretation departs from accepted scientific principles of interpretation by failing to consider and exclude likely explanations of the data and by invoking an explanation that is highly improbable, in view of the known substrate requirements of the 3'–5' exonuclease activity of DNA polymerase.

### (d) Myers, Bost, and Dakis primer extension assays containing a double mismatch

Dr. Brown argues that the double mismatch experiments[23] performed by Mr. Myers, Mr. Bost, and Mr. Dakis indicate that Taq DNA polymerase has 3'–5' exonuclease activity. Brown Decl. ¶ 15–23, at 6:15–10:16. In particular, Dr. Brown contends that a DNA polymerase is highly unlikely to extend the DNA from a 3' mismatched end with incorrect A/A and C/C basepairs. Brown Decl. ¶ 17, at 7:3–16. According to Dr. Brown, for extension to occur from the 3' end of primer DG 227 at the level shown by the data, it would be necessary for Taq DNA polymerase to remove the mismatched bases through a 3'–5' exonuclease activity. *Id.*

Defendants contend that the 3% incorporation found by Myers, Bost, and Dakis

is "merely a reflection of the polymerase function, which can propagate (at a slower rate) through errors in the DNA chain." Klug Decl. ¶ 16, at 6:26–7:13. Therefore, this level of incorporation is "perfectly consistent with the complete absence of any 3'–5' exonuclease activity." *Id.; see also* Abramson II ¶ 19, at 8:22–9:17. Defendants further argue that the two peer reviewed publications which Brown cites, Huang et al. (Plaintiffs' Exhibits in Support of Plaintiffs' Opposition to Defendants' Motions for Summary Judgment ("PX") 140, Tab 8) and Kwok et al. (Abramson II Decl., Exhibit G), actually refute his reasoning by indicating that 3' mismatches can in fact be extended:

> Kwok did not say that extension was "highly unlikely" .... Kwok reported that she actually observed extension with A:A and C:C mismatches, but at relatively lower efficiency (50% and 16%, respectively).... Huang et al. report that efficiency of A:A mismatch extension varied with time: they detected no extension (under the conditions of their assay) at 5 minutes, and 50% extension after 60 minutes.

Abramson II Decl. ¶ 24, at 11:4–24.

The Court agrees that neither the Kwok nor the Huang article supports Dr.

---

**23.** The double mismatch experiment utilizes primer DG227 and template TSYC657. Brown Decl. ¶ 15, at 6:15–20. This primer/template combination has a double mismatch, A/A and C/C, at the 3' end of the primer. *Id.* The assay is performed by mixing an enzyme with radioactively labeled nucleotides and a primer that is either perfectly matched to a template, or mismatched at the 3' end. Abramson II Decl. ¶ 18, at 8:11–20. After a defined period, the DNA from the unincorporated nucleotides is removed by precipitating the DNA with acid, and then the remaining radioactivity is measured to determine how much new DNA the enzyme has formed by adding radioactive nucleotides onto the 3' end of the primer. *Id.* Thus, the assay measures nucleotide incorporation by primer extension. *Id.* With a perfectly matched primer, extension is efficient, showing a high level of radioactivity on analysis *Id.* ¶ 19, at 8:22–9:17. But a mismatched base at the 3' end of the primer presents an obstacle

to further extension. *Id.* If the enzyme has 3'–5' exonuclease activity, it can remove the mismatch and extend the primer. *Id.* Removing the mismatch slows the enzyme down somewhat, and the final radioactive count is lower with the 3' mismatched primer than with the matched primer. *Id.* This is usually expressed as a ratio and a mismatched:matched ratio of 50–80% is typical. *Id.* If the enzyme lacks 3'–5' exonuclease activity, then two outcomes are possible. Either the enzyme will be unable to extend the mismatched primer thereby yielding counts that are not significantly above background, or the enzyme will inefficiently extend the mismatched primer thereby yielding much lower radioactive counts with the 3' mismatched primer than with the matched primer. *Id.* A high mismatched:matched ratio implies that the enzyme has 3'–5' exonuclease activity whereas a low ratio implies that the enzyme lacks 3'–5' exonuclease activity. *Id.*

Brown's conclusion that 3% relative incorporation necessarily indicates the presence of a 3'–5' exonuclease. By not pointing to any objective source indicating the scientific soundness of Dr. Brown's argument with regard to the Myers, Bost, and Dakis assays, the plaintiffs have failed to satisfy their burden under *Daubert II.* Accordingly, the Court finds that Dr. Brown's reanalysis of these assays departs from established scientific principles.

### (e) Ms. Lawyer's mismatch correction assay

Dr. Brown argues that Ms. Lawyer's mismatch correction assay [24] demonstrates 3'–5' exonuclease activity in Taq DNA polymerase. Brown Decl. ¶¶ 24–25, at 10:19–11:21. Dr. Brown relies on a single set of experiments conducted by Ms. Lawyer, in which the incubation of Taq DNA polymerase with the FR 435 primer and a particular template gave rise to amplified DNA that could be cut with Bam HI. *Id.* Defendants contend that Ms. Lawyer's experiments as a whole do not support Dr. Brown's conclusions because she later accumulated evidence sufficient to convince her and her supervisors that a contaminated reagent had rendered these particular results unreliable. Abramson II Decl. ¶¶ 32–33, at 16:19–17:27.

The Court agrees that Dr. Brown's analysis of the Lawyer assay is flawed. Not only does Dr. Brown rely on a single piece of preliminary data and ignores multiple pieces of subsequent contradictory data, he also explicitly rejects the reasoning of the individual performing the experiments. Plaintiffs have offered nothing to indicate such a methodology is rooted in a recognized scientific method. Accordingly, the Court finds that Dr. Brown's reinterpretation of the Lawyer assay departs from established scientific principles.

### (f) Mr. Bost's radioactivity release assay

Dr. Brown argues that Mr. Bost's radioactivity release assay [25] demonstrates that Taq polymerase has a "low [but] measurable level of 3'–5' exonuclease activity." Brown Decl. ¶¶ 26–27, at 11:24–12:16. Defendants contend that Dr. Brown's statements regarding the Bost assay simply have no support in the data. Abramson II ¶¶ 36–37, at 18:27–20:14. Specifically, none of the values measured for Taq DNA polymerase exceeds a control data point representing the release of soluble radioactivity in the absence of enzyme. *Id.* ¶ 36, at 18:27–19:27.

For this reason, the Court finds that Dr. Brown departs from accepted scientific practice by failing to consider background variations in the Bost assay. Additionally, the Court does not agree with plaintiffs that the phrase "within the variability of the background," as used in the defendants' analysis of these results, is a eu-

---

**24.** In the primer correction assay, a polymerase is mixed with a primer that is mismatched at its 3' end to a template. Abramson II Decl. ¶ 29, at 14:20–15:6. The primer-template pair is extended and copied millions of times in a polymerase chain reaction (PCR). *Id.* If the polymerase has 3'–5' exonuclease activity, then it will correct the mismatch prior to extension and copying. *Id.* If the polymerase lacks 3'–5' exonuclease activity, then the mismatch will persist and PCR will yield amplified DNA containing the uncorrected sequence. To determine whether the mismatch is corrected, a restriction enzyme (Bam HI) is incubated with the amplified DNA. *Id.* ¶ 30, at 15:8–23. If the mismatch has been corrected, then Bam HI will be able to cut the amplified DNA. *Id.* If the mismatch persists, then

Bam HI will not be able to cut the DNA. *Id.* Thus, if the DNA is shortened, then the polymerase has corrected the mismatch and has 3'–5' exonuclease activity. *Id.* The size of the DNA fragments is measured by gel electrophoresis. *Id.*

**25.** In the radioactivity release assay, DNA is radioactively labeled at its 3' end and incubated with a polymerase. Abramson II Decl. at ¶ 36, at 18:27–19:27. The DNA is then precipitated with an acid and the soluble radioactivity (i.e. radioactivity released from the DNA) is counted. *Id.* With appropriate controls, the amount of soluble radioactivity can be used to measure the 3'–5' exonuclease activity of the polymerase. *Id.*

phemism for data manipulation. Plaintiff's Opposition to Motion to Exclude 15:20–21. On the contrary, it appears to reflect a healthy respect for statistical variability that is essential to good science. Klug Decl. ¶ 14, at 6:5–15.

### (g) Tindall article and Aliotta article

Dr. Brown bases his opinion that Taq DNA polymerase possesses a 3′–5′ exonuclease activity on the reinterpretation of several peer-reviewed scientific papers, including a 1988 article by Tindall and Kunkel (PX 140, Tab 2) and an article by Aliotta et al. (PX 140, Tab 11). Brown Decl. ¶¶ 28–30, at 12:19–14:18, ¶ 34, at 16:19–17:17. Though he uses the data presented in these publications, Dr. Brown manipulates the data to reach conclusions at odds with the interpretations of the paper's authors. Id. ¶ 29, 13:13–14:8, ¶ 34, at 16:19–17:17. According to the defendants, "Dr. Brown's armchair analysis does not ... qualify as science." Abramson II Decl. ¶ 40, at 22:18–19. Defendants argue that Dr. Brown's recalculation of the Tindall and Kunkel data and the significance he attributes to the negative numbers that he obtains are both invalid. Id. ¶ 38, at 20:18–21:6.

Defendants argue that Dr. Brown's reinterpretation of the scientific literature demonstrates "a complete absence of the rigour that is essential for good science." Klug Decl. ¶ 17, at 8:2. The Court agrees that the reinterpretation of peer-reviewed literature does not conform with the Supreme Court's reasoning that "submission to the scrutiny of the scientific community is a component of 'good science,' in part because it increases the likelihood that substantive flaws in methodology will be detected." Daubert, 509 U.S. at 593, 113 S.Ct. 2786. Not only do the plaintiffs ask the Court to accept as reliable an expert opinion presented without peer review, but they also seek to discredit analyses of the very same data that have been subjected to the scrutiny of the scientific community. Accordingly, the Court finds that Dr.

Brown's methodology departs from accepted scientific practice and falls below the standard for reliability enunciated in Daubert.

Plaintiffs argue that, while defendants may take issue with Dr. Brown's conclusions, his methodologies are sound. Plaintiffs claim that Dr. Brown's conclusions are based on valid scientific techniques and procedures described in defendants' own laboratory notebooks. Plaintiffs' argument, however, misses the point; Dr. Brown did not use any of these laboratory techniques himself. It is undisputed that Dr. Brown performed no scientific tests of his own. Indeed, although defendants provided plaintiffs with samples for testing, no results of tests on those samples have been presented.

Instead, Dr. Brown relies on "reinterpretation" and "reanalysis" of data and findings in studies performed by others, all of whom reach conclusions contrary to his. Dr. Brown points to no objective source that indicates that this "reinterpretation" or "reanalysis" is an accepted methodology in this field. In addition, even if it were, Dr. Brown points to no objective source that suggests that selective reliance on data, disregard and lack of explanation for contrary findings, ignoring alternative explanations for empirical results, and relying on problematic data constitutes a methodology adopted by at least a minority of scientists in this field.

The Ninth Circuit has upheld the exclusion of expert testimony where the expert selectively chose his support from the scientific landscape. Lust v. Merrell Dow Pharmaceuticals, Inc., 89 F.3d 594, 598 (9th Cir.1996). In addition, at least one other court has excluded expert testimony where the experts based their opinions on data in the published articles of others who reached contrary conclusions. Jones v. United States, 933 F.Supp. 894, 898 (N.D.Cal.1996) (Williams, J.) ("This tactic does not qualify as good science."). Similarly, in General Electric Co. v. Joiner, 522 U.S. 136, 118 S.Ct. 512, 139 L.Ed.2d 508

(1997), the Supreme Court upheld the exclusion of expert testimony based on analysis of epidemiological studies performed by others because the expert's conclusion contradicted the conclusions of the authors of those studies.

The Supreme Court's opinion in *Joiner* is particularly illustrative. That case involved the testimony of plaintiff's expert that exposure to PCBs caused plaintiff's lung cancer. *Id.* at 517–19, 118 S.Ct. 512. In *Joiner*, although certain epidemiological studies relied upon by the expert found that the incidence of lung cancer death among PCB workers was somewhat higher than ordinarily expected those studies ultimately concluded that the increase was not statistically significant and did not suggest a link between the increase in lung cancer deaths and exposure to PCBs. *Id.* at 519, 118 S.Ct. 512. The Supreme Court held that

> nothing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence which is connected to existing data only by the ipse dixit of the expert. A court may conclude that there is simply too great an analytical gap between the data and the opinion proffered.

*Id.* Therefore, the district court had not abused its discretion under *Daubert* by excluding the expert's testimony. *Id.*

In this case, like *Joiner*, "there is simply too great an analytical gap between the data and the opinion proffered." *Id.* Like the expert in *Joiner*, Dr. Brown analyzed data that was not his own and reinterpreted it in a manner inconsistent with the conclusions of those who originally generated it. Dr. Brown does not explain why he considers only his selective reinterpretation of the data and ignores the large body of scientific literature finding that Taq DNA polymerase does not contain 3′–5′ exonuclease activity. Dr. Brown, like the expert in *Joiner*, fails to connect the existing data to his conclusions using a

valid scientific method practiced by a minority of scientists in his field.

Plaintiffs' reliance on *Ruiz–Troche v. Pepsi Cola of Puerto Rico*, 161 F.3d 77 (1st Cir.1998), does not change the Court's conclusion. Relying on *Ruiz–Troche*, plaintiffs contend that *Daubert* does not require the party proffering the expert testimony to prove the correctness of the expert's opinion. In *Ruiz–Troche*, however, the First Circuit found that the expert's testimony on the amount of drugs consumed by the plaintiff was premised on a methodology that was supported by the scientific literature. *Id.* at 83–84. Here, Dr. Brown has failed to convince this Court that the selective culling of excerpts from defendants' laboratory notebooks while ignoring the large body of scientific literature based on reproducible results is a methodology accepted by at least a minority of scientists in the relevant field.

Similarly, plaintiffs' reliance on *Kennedy v. Collagen Corp.*, 161 F.3d 1226 (9th Cir. 1998) is unpersuasive. Plaintiffs cite *Kennedy* for the proposition that disputes as to the strength of an experts' qualifications go to the weight of the testimony, not its exclusion.[26] In *Kennedy*, the Ninth Circuit determined that the testimony of plaintiffs' expert was admissible under *Daubert* because the expert had "relied upon a wide variety of objective, verifiable evidence" to establish that defendant's medical product caused autoimmune disorders. *Id.* at 1228. The Ninth Circuit pointed to: (1) a peer-reviewed article co-authored by the expert that supported his opinion, (2) other scientific publications and clinical studies establishing a link between the defendant's product and autoimmune diseases, and (3) testimony from one of defendant's scientists validating the expert's methodology. *Id.* Thus, *Kennedy* is distinguishable from the case at bar because Dr. Brown's expert opinion is devoid of any such factors.

For the foregoing reasons, the Court finds that the studies upon which Dr.

**26.** Letter Brief dated April 14, 1999, at page 2.

Brown relied were not sufficient, individually or in combination, to support his conclusion that Taq DNA polymerase contains 3'-5' exonuclease activity. *See Joiner,* 118 S.Ct. at 519. This, combined with the other *Daubert* factors discussed above, renders Dr. Brown's testimony inadmissible.[27] Accordingly, the Court hereby GRANTS defendants' motions to exclude the testimony of Dr. Brown.

## B. Dr. Edwin Minkley

■ The Chiron defendants argue that Dr. Minkley is not qualified to testify on the 3'-5' exonuclease activity of Taq DNA polymerase, noting in particular that plaintiffs have not offered any evidence of Dr. Minkley's qualifications.[28] In particular, the Chiron defendants take issue with Dr. Minkley's statement that genetic complementation is evidence of 3'-5' exonuclease activity or its equivalent, on which plaintiffs rely to support their claim of infringement under the doctrine of equivalents.[29] The Chiron defendants argue that Dr. Minkley's testimony is contrary to accepted scientific principles and is directly contradicted by the Suzuki et al. article submitted by Dr. Benkovic in his declaration in support of plaintiffs' opposition to defendant's motion for summary judgement.[30] Additionally, the Chiron defendants allege that Dr. Minkley's large financial stake in the outcome of the litigation weighs against the admissibility of his testimony.[31]

Plaintiffs contend that Dr. Minkley is "a qualified expert under FRE 702" by virtue of his position at Three Rivers Biologicals and his Ph.D. in biochemistry from Harvard University.[32] Furthermore, Dr. Minkley is one of the named inventors on the '708 Patent.

The Court finds that the Chiron defendants have failed to establish that Dr. Minkley's testimony is inadmissible under *Daubert.* While Dr. Minkley's testimony is susceptible to some of the same criticism as Dr. Brown's testimony, Dr. Minkley does not attempt to reinterpret other scientists' data. Thus, the strongest argument for excluding Dr. Brown's testimony—that his methodologies do not represent valid scientific practices—cannot be applied to Dr. Minkley. Accordingly, the Court is unwilling to exclude the testimony of Dr. Minkley under *Daubert,* and therefore DENIES the Chiron defendants' motion to exclude the testimony of Dr. Minkley.

## C. Dr. Stephen J. Benkovic

■ The Chiron defendants argue the Dr. Benkovic's testimony is inadmissible under the relevance requirement of *Daubert.*[33] Specifically, the Chiron defendants contend that a significant part of Dr. Benkovic's testimony interprets the prosecution history of the '708 Patent, contradicting the Court's own claim construction.[34] The Chiron defendants also contend that the rest of Dr. Benkovic's testimony is

**27.** Defendants also argue that Dr. Brown's testimony does not satisfy the "fit" requirement of Fed.R.Evid. 702. Rule 702 includes both a reliability, or "scientific knowledge," requirement and a relevance, or "fit," requirement. *Daubert,* 509 U.S. at 589–91, 113 S.Ct. 2786. Because the Court has already found Dr. Brown's testimony inadmissible under the reliability prong, the Court sees no reason to address defendants' claim that his testimony also fails to satisfy the relevance prong of Rule 702.

**28.** Chiron Defendant's Motion to Exclude at 14:9–11.

**29.** *Id.* at 14:19–21; Plaintiffs' Opposition to Motion for Summary Judgment ("Plaintiffs' SJ Opposition") at 16:5–11.

**30.** Benkovic Decl., Exhibit C at 9673; Chiron's Motion to Exclude at 14:21–23.

**31.** Chiron's Motion to Exclude at 14:17–18.

**32.** Plaintiffs' Opposition to Motion to Exclude 8:3–6.

**33.** Chiron's Motion to Exclude at 11:20.

**34.** *Id.* at 12:2–13.

irrelevant and inadmissible because it discusses genetic complementation and proof-reading in a manner inconsistent with established scientific principles.[35]

Plaintiffs argue that Dr. Benkovic's testimony on the prosecution history of the patent is relevant background about the role of 3'–5' exonuclease activity in the claimed invention.[36] Furthermore, plaintiffs argue that the rest of Dr. Benkovic's testimony "bears on infringement under the Doctrine of Equivalents" and therefore satisfies *Daubert*'s relevance requirement.[37]

Testimony from a scientific expert must meet the two prongs of Rule 702, i.e., both a reliability, or "scientific knowledge," requirement and a relevance, or "fit," requirement. *Daubert*, 509 U.S. at 589–91, 113 S.Ct. 2786. Since the Chiron defendants raise no objections to the reliability of Dr. Benkovic's testimony, the Court need only consider its relevance. On this matter, the Court agrees with plaintiffs that Dr. Benkovic's testimony directly bears on their claim of infringement under the doctrine of equivalents. Consequently, Dr. Benkovic's testimony is admissible under *Daubert*. The Court hereby DENIES the Chiron defendants' motion to exclude the testimony of Dr. Benkovic.

### 2. Motions for Summary Judgment on the Issue of Non-infringement

Defendants move for summary judgment on the issue of whether defendants' polymerase products infringe the '708 Patent either literally or under the doctrine of equivalents.

**35.** *Id.* at 12:14–13:10.

**36.** Plaintiffs' Opposition to Motion to Exclude at 18:14 n. 10.

**37.** *Id.* at 18:14.

**38.** Roche's ("Roche's SJ Motion") at 8:11–10:24, 13:12–15; Chiron's Motion for Summary Judgment ("Chiron's SJ Motion") at

### A. Literal Infringement

#### (1) Taq DNA polymerase, Tth DNA polymerase, and their derivatives

Defendants argue that plasmids pLSG5, pLSG8, pRDA3–2, pLK103, and pLSG32 (which encode, respectively, Taq DNA polymerase, Taq DNA polymerase Stoffel fragment, Taq DNA polymerase CS mutant, Taq DNA polymerase FS mutant, and Tth DNA polymerase) do not infringe the '708 Patent because each of the enzymes lacks a 3'–5' exonuclease activity.[38] In addition, defendants contend that because these five plasmids do not infringe the '708 Patent, the host cells that contain these plasmids and the processes used to construct and culture these plasmids also do not literally infringe the '708 Patent.[39]

Plaintiffs contend that they have raised sufficient factual issues regarding the 3'–5' exonuclease activity of Taq DNA polymerase to overcome a summary judgment motion.[40] In particular, plaintiffs cite the testimony of Dr. Brown, excerpts from several Roche/Cetus notebooks, and the statements of several Roche/Cetus employees as evidence of a factual dispute over the 3'–5' exonuclease activity.[41]

█ █ To establish literal infringement, every limitation set forth in a patent claim must be found in the accused product or process exactly. *See Laitram Corp. v. Rexnord, Inc.*, 939 F.2d –1533, 1535 (Fed. Cir.1991); *Exxon Chem. Patents, Inc. v. Lubrizol Corp.*, 64 F.3d 1553, 1559 (Fed. Cir.1995) (finding that literal infringement requires that every limitation in the claims be found in the accused product). With regard to the enzymes in dispute, the plaintiffs fail to demonstrate the presence of 3'–5' exonuclease activity—a necessary

4:10–5:10, 7:18–8:20; White Decl. ¶¶ 4–5, 7, 9, 13, 15–16.

**39.** *Id.*

**40.** Plaintiffs' SJ Opposition at 2:4–10.

**41.** *Id.* at 3:13–14:4; Brown Decl. *passim;* PX 118A, 131, 134, 167.

element of one of the limitations in the claim—and are unsuccessful in rebutting the overwhelming evidence to the contrary.

Plaintiffs' evidence is insufficient to raise a genuine issue of whether Taq DNA polymerase possesses 3'–5' exonuclease activity. First, plaintiffs have failed to produce any data showing that Taq DNA polymerase possesses 3'–5' exonuclease activity despite the Court's order compelling the defendants to produce this enzyme to plaintiffs for testing.[42] Second, the Court has found that Dr. Brown's testimony, the only evidence which purports to establish that Taq DNA polymerase possesses 3'–5' exonuclease activity, lacks sufficient indicia of reliability to be admitted under *Daubert.* Plaintiffs' remaining evidence—consisting of excerpts from several Roche/Cetus notebooks and statements of several Roche/Cetus employees—amounts to nothing more than inappropriate recharacterizations of defendants' documents and statements.[43] Thus, these items do not create a factual dispute over 3'–5' exonuclease activity. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 254, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986) (finding that there may be no genuine issue of material fact if "the evidence is of insufficient caliber or quantity to allow a rational finder of fact" to find for the nonmoving party); *see also Matsushita Elec. Indus., Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986) (finding that in some circumstances the factual con-

text may render the nonmoving party's claim implausible, thereby requiring the nonmoving party to come forward with "more persuasive evidence" to support the claim "than would otherwise be necessary"). Lastly, plaintiffs have failed to advance *any* arguments suggesting that Taq DNA polymerase Stoffel fragment, Taq DNA polymerase CS mutant, Taq DNA polymerase FS mutant, or Tth DNA polymerase possess 3'–5' exonuclease activity.

In contrast, defendants provide substantial evidence that Taq DNA polymerase lacks 3'–5' exonuclease activity. First, scientific publications uniformly report that Taq DNA polymerase lacks 3'–5' exonuclease activity.[44] Second, plaintiffs' expert, Dr. Benkovic, testified at his deposition that he knew of no evidence that Taq DNA polymerase has 3'–5' exonuclease activity.[45] Dr. Benkovic also published an article in 1990 noting the lack of any detectable 3'–5' exonuclease activity in Taq DNA polymerase.[46]

To avoid summary judgment, the plaintiffs, as non-movants, must make a showing sufficient to establish the existence of an element essential to their case for which they will bear the burden of proof at trial. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 322–23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Even viewed in a light most favorable to the plaintiffs, the undisputed evidence before the Court indicates that the accused enzymes do not possess 3'–5' exonuclease activity. In the absence of this

---

**42.** Roche's Reply to Plaintiffs' SJ Opposition ("Roche's SJ Reply") at 6:19–7:18; Chiron's Reply to Plaintiffs' SJ Opposition ("Chiron's SJ Reply") at 1:5–7, 1:14–15, 3:10–14.

**43.** Although the Court has determined that Dr. Brown's opinion is unreliable and inadmissible under *Daubert,* the Court has not excluded the documents on which Dr. Brown bases his opinion. These documents remain part of the evidentiary record for the present motions for summary judgment. However, the Court finds this remaining evidence is of insufficient caliber or quantity to allow a rational jury to make a finding in favor of the plaintiffs. *See Anderson v. Liberty Lobby, Inc.,*

477 U.S. 242, 254, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

**44.** · Roche's SJ Reply at 2:3–4:16; Chiron's SJ Reply at 1:10–12 and 3:4–9; Abramson I Decl. at Tabs 2–4, 6, 8–27; Goodman Decl., Exhibit B; PX 140 at Tabs 2–27.

**45.** Roche's SJ Reply at 4:17–5:19; Benkovic Depo. at 99:19–101:9, 106:24–107:11, 108:21–110:1.

**46.** Roche's SJ Reply at 4:20–26; Carroll & Benkovic, 90 Chem. Rev. 1291, 1302 (1990) (attached as Exhibit F to Powell Decl.).

essential element, plaintiffs' literal infringement claim must fail. Accordingly, the Court grants defendants' motions for summary judgment that pLSG5, pLSG8, pLSG32, pRDA3–2, and pLK103, the processes for constructing these plasmids, and the host cell strains containing these plasmids do not literally infringe the '708 Patent.

#### (2) UITma DNA polymerase

Defendants also argue that plasmid pTma15,[47] which encodes UITma DNA polymerase, does not infringe the '708 Patent because the enzyme does not possess 5'–3' exonuclease activity.[48]

Plaintiffs do not dispute that this plasmid encodes an enzyme that lacks 5'–3' exonuclease activity.[49] Nevertheless, plaintiffs assert that plasmid pTma15[50] infringes the '708 Patent because it was originally derived from an allegedly infringing plasmid encoding the full-length coding region for Tma DNA polymerase, pTma13.[51]

Literal infringement requires that every limitation set forth in a patent claim be found in the accused product or process exactly. See Laitram, 939 F.2d at 1535. In its claim construction order, the Court held that the term "DNA Polymerase I" in the claims of the '708 Patent referred to an enzyme that is lethal or debilitating to growth of the host cell strain when expressed from a multicopy plasmid and that exhibits three enzymatic activities, namely, 3'–5' exonuclease activity, 5'–3' exonuclease activity and polymerase activity. The Court finds that plaintiffs have not established the presence of 5'–3' exonuclease activity in UITma DNA polymerase, a necessary element of one of the claims. In addition, plaintiffs' argument that infringement attaches equally to the derivative of an infringing plasmid is not persuasive. One of the purposes of patent law is to encourage competitors to design around the patented technology. See State Indus., Inc. v. A.O. Smith Corp., 751 F.2d 1226, 1236 (Fed.Cir.1985) (one benefit of the patent system is the ability to design around a competitor's patented products). It is axiomatic that the claims define the scope of the invention, and thus infringement cannot be inferred from mere comparisons between two accused devices, such as pTma15 and pTma13. See Amstar Corp. v. Envirotech Corp., 823 F.2d 1538, 1545 (Fed.Cir.1987) ("a comparison with an adjudicated device cannot serve to encompass within the patent's exclusionary scope a device that does not in fact constitute an infringement of the claim"); see also Lund Indus., Inc. v. GO Indus., Inc., 938 F.2d 1273, 1275 (Fed.Cir.1991) ("A proper infringement analysis requires comparison of the accused design to the patent claims, not another design."); KSM Fastening Sys., Inc. v. H.A. Jones Co., 776 F.2d 1522, 1530 (Fed.Cir.1985) (finding that patent infringement requires the modified device to fall "within the admitted or adjudicated scope of the claims"). As such, the Court must focus its inquiry on whether pTma15 possesses every limitation set forth in the

---

**47.** Defendants raise a similar argument with respect to pLSG8, the plasmid encoding Taq DNA polymerase Stoffel fragment. However, the Court has already found that pLSG8 does not literally infringe the '708 Patent because the enzyme it encodes lacks 3'–5' exonuclease activity. Accordingly, the Court need not address the parties' further arguments regarding pLSG8.

**48.** Roche's SJ Motion at 11:10–18, 13:16–19; Chiron's SJ Motion at 5:11–15, 8:21–24.

**49.** Chiron's SJ Reply at 6:25–7:3; Roche's SJ Reply at 9:19–22; Plaintiffs' Amended Responses and Objections To Roche Molecular's First Set of Requests For Admissions, Nos. 14 & 25 (attached as Exhibit J to Powell Decl.).

**50.** Plaintiffs raise a similar argument with respect to plasmid pLSG8 and its derivation from allegedly infringing plasmid pLSG5. However, this argument is moot in light of the Court's finding above that neither pLSG8 nor pLSG5 literally infringes the '708 Patent because the enzymes they encode lack 3'–5' exonuclease activity.

**51.** Plaintiffs' SJ Opposition at 3:5–12.

claims of the '708 Patent, and not on the plasmid from which pTma15 was derived. *See Laitram*, 939 F.2d at 1535. Accordingly, the Court finds that pTma15, the plasmid encoding Tma DNA polymerase, does not literally infringe the '708 Patent since defendants have established that Tma DNA polymerase lacks 5'-3' exonuclease activity.

## B. Doctrine of Equivalents

Defendants also argue that the defendants' plasmids do not infringe the '708 Patent under the doctrine of equivalents because the enzymes they encode possess no equivalent to the missing 3'-5' exonuclease activity. Plaintiffs counter that the 3'-5' exonuclease activity present in the claimed invention performs a proofreading function and that an equivalent proofreading function is present in Taq DNA polymerase.[52] To support this argument, plaintiffs point to the testimony of Dr. Benkovic, who states that the ability of Taq DNA polymerase to discriminate between matched and mismatched nucleotides contributes to its fidelity and can therefore be viewed as a type of proofreading.[53] Plaintiffs also cite three other factors that they claim could support a finding of infringement under the doctrine of equivalents: (1) the ability of Taq DNA polymerase to genetically complement the claimed invention, (2) the initial naming of Taq DNA polymerase as Taq DNA polymerase 1, and (3) the ability of Taq DNA polymerase to catalyze nucleotide excision through pyrophosphorolysis.[54]

■■ A device that does not literally infringe a claim may nonetheless infringe under the doctrine of equivalents if every element of the claim is literally or equivalently present in the accused device. *See Sage Prods., Inc. v. Devon Indus., Inc.*, 126 F.3d 1420, 1423 (Fed.Cir.1997); *Pennwalt Corp. v. Durand–Wayland, Inc.*, 833 F.2d 931, 934–35 (Fed.Cir.1987). The doctrine of equivalents must be applied on an element-by-element basis. *See Warner–Jenkinson Co. v. Hilton Davis Chem. Co.*, 520 U.S. 17, 117 S.Ct. 1040, 1049, 137 L.Ed.2d 146 (1997). Thus, to establish infringement under the doctrine of equivalents, the accused device must be shown to include an equivalent for each literally absent claim limitation. *See Dawn Equip. Co. v. Kentucky Farms Inc.*, 140 F.3d 1009, 1015 (Fed.Cir.1998).

■ In determining equivalence, the Court may apply the insubstantial difference test, asking whether substantial differences exists between the accused device and the claimed invention. *See Warner–Jenkinson*, 117 S.Ct. at 1054; *see also Digital Biometrics, Inc. v. Identix, Inc.*, 149 F.3d 1335, 1349 (Fed.Cir.1998). In some circumstances, the Court may apply the function-way-result test, asking whether the element at issue in the accused device performs substantially the same function, in substantially the same way, to achieve substantially the same result as the limitation at issue in the claim.[55] *See Warner–Jenkinson*, 117 S.Ct. at 1054; *see also Dawn Equip.*, 140 F.3d at 1016.

■ Although equivalence is a factual matter normally reserved for the jury, the trial court should grant summary judgment in any case where no reasonable fact finder could find equivalence. *See Warner–Jenkinson*, 117 S.Ct. at 1053 n. 8 ("Where the evidence is such that no rea-

---

**52.** Plaintiffs' SJ Opposition at 14:12–16:4.

**53.** Benkovic Decl. ¶¶ 32–35, at 14:1–24.

**54.** Plaintiffs rely on Dr. Minkley's testimony for the first point only and on Dr. Benkovic's testimony for all three points. Benkovic Decl. ¶¶ 26–36, at 12:4–15:9; Benkovic II Decl. ¶¶ 5–10, at 2:2–3:23.

**55.** In *Warner–Jenkinson,* the Supreme Court refrained from deciding which test to apply, stating that it expected the Federal Circuit to "refine the formulation of the test for equivalence in the orderly course of case-by-case determinations" and leaving "such refinement to that court's sound judgment in this area of its special expertise." *Warner–Jenkinson,* 117 S.Ct. at 1054.

sonable jury could determine two elements to be equivalent, district courts are obliged to grant partial or complete summary judgment."); *see also Laitram Corp. v. Morehouse Indus., Inc.,* 143 F.3d 1456, 1464 (Fed.Cir.1998); *Digital Biometrics,* 149 F.3d at 1349. Accordingly, the central issue here is whether Taq DNA polymerase "matches the function, way and result of the claimed element, or whether the substitute element plays a role substantially different from the claimed element." *Warner–Jenkinson,* 117 S.Ct. at 1054; *see also Vehicular Technologies Corp. v. Titan Wheel Intern., Inc.,* 141 F.3d 1084, 1089 (Fed.Cir.1998).

▆ After careful consideration of the record, the Court concludes that no reasonable jury could find that the claimed invention and the accused polymerase products are equivalent. The issue presently before this Court is analogous factually and legally to the issues raised in *Genentech v. Wellcome Foundation Ltd.,* 29 F.3d 1555 (Fed.Cir.1994), where the Federal Circuit held that a claim limitation of "human tissue plasminogen activator" was not equivalent to an artificially produced, modified form of this protein. *Id.* at 1569. Here, defendants' plasmids encode proteins that are even more distinct structurally and functionally from plaintiffs' claimed invention than were the proteins at issue in *Genentech.* The Federal Circuit, in *Genentech,* considered whether claims that included the limitation "human tissue plasminogen activator" ("human t-PA") were infringed under the doctrine of equivalents by a modified form of human t-PA ("PEIX") lacking structural features of the natural protein. *Id.* Applying the function-way-result test, the Federal Circuit found no infringement "in view of the overwhelming and undisputed evidence that the two possess dramatically different properties and structure." *Id.* at 1568. Here, DNA polymerase I and Taq DNA polymerase, which are distinct proteins isolated from two different bacterial species, exhibit many more differences than do human t-PA and FEIX. In particular, Taq DNA polymerase is missing amino acids critical for 3′–5′ exonuclease activity· and as a result is missing the structural domain necessary for this activity.[56]

Second, the Court is unpersuaded by plaintiffs' arguments that the accused polymerases' ability to perform error correction by pyrophosphorolysis and their ability to discriminate between matched and mismatched nucleotide bases are equivalent to 3′–5′ exonuclease activity. In applying the doctrine of equivalents, this Court may use the function-way-result test by focusing on the function served by a particular claim element, the way that element serves that function, and the result thus obtained by that element. *See Warner–Jenkinson,* 117 S.Ct. at 1054; *see also Dawn Equip.,* 140 F.3d at 1016 (applying function-way-result test); *Kahn v. General Motors Corp.* 135 F.3d 1472, 1478 (Fed. Cir.1998) (same); *Insituform Technologies, Inc. v. Cat Contracting, Inc.,* 161 F.3d 688, 693 (Fed.Cir.1998) (same). In analyzing the function-way-result issues, the Court has looked to the testimony and publications of plaintiffs' own expert, Dr. Benkovic. The function of 3′–5′ exonuclease activity is to correct errors that have occurred during DNA replication by excising mismatched nucleotides.[57] The way in which this is achieved is by removing mismatched nucleotides through the process of hydrolysis.[58] The result is to increase fidelity during DNA replication.[59]

**56.** L. Blanco et al., Gene 100:27–38 (1991) (attached as Exhibit C to Goodman Decl.); Y. Kim et al., Nature 376:612–16 (1995) (attached as Exhibit 9 to Chiron's Request for Judicial Notice).

**57.** A. Gupta, C. DeBrosse & S.J. Benkovic, 257 J. Biol. Chem. 7689, 7689 (1982) (attached as Exhibit K to Powell Decl.).

**58.** A. Kornberg & T.A. Baker, DNA Replication 115 (2d ed.1992) (attached as Exhibit L to Powell Decl.); Benkovic Depo. at 74:1–7.

**59.** S. Carroll & S.J. Benkovic, 90 Chem. Rev. 1291, 1304 (1990) (attached as Exhibit F to Powell Decl.) (stating that "presence of 3′

Plaintiffs have failed to identify any property in Taq DNA polymerase that satisfies the "way" prong of the test by correcting errors through the hydrolytic removal of mismatched nucleotides. *See Insituform,* 161 F.3d at 694 (finding that the claimed invention did not provide a vacuum in the same "way" as the accused device). Consequently, no reasonable jury could find on the evidence in the record that the accused polymerases are equivalent to the claimed invention via the function-way-result test. *See Warner–Jenkinson,* 117 S.Ct. at 1053 n. 8 ("Where the evidence is such that no reasonable jury could determine two elements to be equivalent, district courts are obliged to grant partial or complete summary judgment."); *see also Dawn Equip.,* 140 F.3d at 1016 (applying the function-way-result test and finding that the record as a whole did not support the jury's verdict of infringement under the doctrine of equivalents).

■ Third, the Court is also not persuaded by plaintiffs' arguments that there are insubstantial differences between the accused products and the claimed invention.[60] In particular, the Court has construed the term "DNA Polymerase I" in the claims of the '708 Patent to require 3'–5' exonuclease activity. Plaintiffs' attempt to substitute the broader concepts of fidelity or proofreading in its place is improper, since "the doctrine of equivalents is not a license to ignore or erase structural and functional limitations of the claim, limitations on which the public is entitled to rely in avoiding infringement." *Athletic Alternatives, Inc. v. Prince Mfg., Inc.,* 73 F.3d 1573, 1582 (Fed.Cir.1996) (internal quotations and citations omitted); *see also Pennwalt Corp. v. Durand–Wayland, Inc.,* 833 F.2d 931, 935 (Fed.Cir.1987) ("a court may not, under the guise of applying the doctrine of equivalents, erase a plethora of meaningful structural and functional limi-

tations of the claim on which the public is entitled to rely in avoiding infringement").

■ Fourth, the Court finds that plaintiffs' argument regarding the ability of Taq DNA polymerase to genetically complement the claimed invention is irrelevant. Genetic complementation refers to the ability of Taq DNA polymerase to substitute for DNA polymerase I in an E.coli cell, allowing the cell to survive and propagate.[61] Genetic complementation addresses the function of the invention as a whole rather than comparing the accused products to the invention on an element-by-element basis. *See Warner–Jenkinson,* 520 U.S. at 29, 117 S.Ct. 1040 ("Each element contained in a patent claim is deemed material to defining the scope of the patented invention, and thus the doctrine of equivalents must be applied to individual elements of the claim, not the invention as a whole."); *see also Chiuminatta Concrete Concepts v. Cardinal Indus., Inc.,* 145 F.3d 1303, 1309–10 (Fed. Cir.1998) (stating that the known interchangeability between structural features in the patented invention and the accused device "does not obviate the statutory mandate to compare the accused structure to the corresponding structure").

■ Lastly, the fact that the accused polymerase product has a similar name to the patented invention is insufficient to show that they are equivalents. Plaintiffs' argument regarding the use of the name "Taq DNA Polymerase I" relies solely on semantics and fails to establish that the accused polymerase products contain each element of the relevant claims in the '708 Patent. *See Markman v. Westview Instruments, Inc.,* 52 F.3d 967, 974, 983 (Fed.Cir.1995) (affirming district court's grant of judgment as a matter of law for non-infringement despite defendant's use of the claim term "inventory" to describe defendant's product); *see also Phillips Pe-*

exonuclease increased the accuracy of synthesis about 30–fold")

**60.** Plaintiffs' SJ Opposition at 25:17–26:2.

**61.** Benkovic Decl. ¶ 26, at 12:4–9.

*troleum Co. v. Huntsman Polymers Corp.,* 157 F.3d 866, 877 (Fed.Cir.1998) (finding that the use of the term "block copolymer" in defendants' documents internal documents and product formulation sheets did not raise a genuine issue of fact even though the term "block copolymer" appeared in plaintiff's claims).

Thus, the Court grants defendants' motions for summary judgment that plasmids pLSG5, pLSG8, pLSG32, pRDA3–2, pLK103 and pTma15, the processes for constructing these plasmids, and the host cell strains containing these plasmids do not infringe the '708 Patent under the doctrine of equivalents.

## CONCLUSION

For the foregoing reasons, defendants' motions to exclude the declaration and testimony of Dr. William E. Brown are hereby GRANTED. Defendants Chiron's motion to exclude the testimony of plaintiffs' other experts is DENIED. Defendants' motions for summary judgment of non-infringement of the '708 Patent are hereby GRANTED.

**IT IS SO ORDERED.**